**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


RONALD WAYNE GIBSON, SR.,      )
                                       )
            Plaintiff,       )
                                       )      Civil Action No. 12-858
          v.               )
                                       )      Judge Mark R. Hornak
CAROLYN W. COLVIN,         )      Magistrate Judge Lisa Pupo Lenihan
Commissioner of Social Security,    )
                                       )
           Defendant.     )


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION


## I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

## II. REPORT

**A.    BACKGROUND**

**1. Procedural**

Ronald Wayne Gibson, Sr. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  Plaintiff filed for benefits claiming an inability to

work due to disability beginning November 14, 2008. (R. at 161 – 69).[1] Plaintiff amended this onset date to November 19, 2008 at his administrative hearing, due to an unfavorable decision rendered on November 18, 2008 for a previously filed disability claim regarding the same allegedly disabling impairments. (R. at 59 – 60, 88 – 101). At the time of his most recent application for benefits – at issue in the present case – Plaintiff's allegedly disabling impairments included multiple sclerosis ("MS"), bulging discs, two crushed discs in the neck, severe depression, bipolar disorder, and epilepsy. (R. at 224). Despite his claims, Plaintiff was again denied benefits under the Act. (R. at 1 – 5, 16 – 51, 108 – 19). Having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 11, 13).

## 2. General

Plaintiff, born on August 17, 1967, was forty one years of age at the time of his most recent application for benefits, and forty two years of age at the time of his administrative hearing. (R. at 48). Plaintiff resided with his wife and had adult children. He received medical benefits from the state. (R. at 64 – 65).

Plaintiff had only an eighth grade-level education, but obtained a general equivalency diploma ("GED"). (R. at 64). Plaintiff's work history included employment as a "laborer" and as a "short-order cook." (R. at 195). His earnings between 1986 and 2008 totaled $48,084.17. (R. at 178 – 80). He worked briefly in 2009 as a cook, and earned $181.00. (R. at 171).

In his own self-report, Plaintiff claimed that he was unable to work as a result of pain and fatigue stemming from his alleged impairments. (R. at 207 – 09, 211 – 12). He stated that he was unable to walk more than two blocks, slowly, without taking a rest, he could pay attention only for a few minutes, he could not finish things that he started, he could not follow written

---

[1]  Citations to ECF Nos. 5 – 5-17, the Record, *hereinafter*, "R. at __."

instructions, he could not follow spoken instructions, he did not get along well with authority figures, he did not handle stress well, and he did not handle changes in routine well. (R. at 208 – 09). Plaintiff allegedly relied upon a cane to ambulate. (R. at 209).

Plaintiff indicated that he spent his days watching television, playing cards, and reading, and also slept frequently as a result of alleged medication side-effects. (R. at 203 – 04). His wife was reportedly responsible for preparing meals, completing housework, shopping, and paying bills. (R. at 205 – 06). Plaintiff did not have any issues with self-care, except that he would sit while taking a shower. (R. at 204). Plaintiff was capable of going outside alone and attending appointments, but did not drive as a result of alleged seizures and medication side-effects. (R. at 206 – 07). Plaintiff did not allege any difficulty interacting with other people, and he had not lost work as a result of difficulties interacting with others. (R. at 208 – 09).

### 3. Treatment History

Plaintiff was examined by his primary care physician, Edward Balestrino, D.O., on July 7, 2008 for complaints of mid back pain. (R. at 560). Dr. Balestrino noted that Plaintiff had a history of neck and lower back pain for which he had been prescribed medication. (R. at 560). Plaintiff also complained of leg pain, and Dr. Balestrino thought that this may have been related to potential MS, for which Plaintiff was to begin seeking treatment with a specialist. (R. at 560). Dr. Balestrino observed that Plaintiff had some tenderness over the spinous processes at T6 and T7, but no paraspinal tenderness. (R. at 560). Plaintiff's gait was normal. (R. at 560). Plaintiff was to continue using his prescribed medications, which he stated had provided relief from pain in the past. (R. at 560).

Plaintiff presented at Butler Memorial Hospital in Butler, Pennsylvania on August 3, 2008, due to attempted suicide by overdose of prescription Tegretol. (R. at 260 – 92). Plaintiff

was calm, but incoherent. (R. at 260, 263). Physical examination found no tenderness in the neck or back, and Plaintiff had normal sensation and reflexes. (R. at 262 – 63). CT scans of Plaintiff's head and cervical spine were ordered. A CT scan of the head revealed no acute findings, but did demonstrate chronic ischemic changes of the white matter. (R. at 267). CT scan of the cervical spine demonstrated no fracture, malalignment, dislocation, or other acute findings. (R. at 269). An MRI scan of the cervical spine revealed only left sided C5 – C6 disc protrusion, but no stenosis or MS plaques. (R. at 378). Plaintiff was stabilized, and hospital staff diagnosed suicidal ideation with overdose. (R. at 371). While being treated, Plaintiff admitted to alcohol use. (R. at 261). Plaintiff's wife informed staff that Plaintiff drank in a "binge" pattern – he could go for months without drinking and then would drink for days. (R. at 285). A prior overdose with Darvocet and alcohol was also noted. (R. at 357). Plaintiff was discharged from the hospital on August 5, 2008. (R. at 353). His discharge diagnoses included Tegretol overdose, history of hypertension, history of alcohol abuse, and history of MS. (R. at 353).

Plaintiff returned to Dr. Balestrino on October 16, 2008 for complaints of upper and lower back pain for the past two weeks. (R. at 558). Plaintiff claimed that his current pain medications were not providing adequate relief. (R. at 558). Dr. Balestrino wanted to avoid using narcotic pain medications. (R. at 558). He prescribed a Medrol Dosepak, Soma, and physical therapy. (R. at 558). Dr. Balestrino recorded that, upon examination, Plaintiff was neurologically intact, had appropriate insight and judgment, and was alert and oriented. (R. at 558).

Plaintiff was admitted to the emergency department at Butler Memorial Hospital on October 20, 2008. (R. at 247 – 59). He presented with a five inch laceration to the back of his head as a result of a fall while intoxicated. (R. at 247 – 48). Plaintiff was noted to be loud,

inappropriate, agitated, defensive, angry, hostile, combative, threatening, and sexually aggressive towards staff members. (R. at 247 – 48). Police were notified of Plaintiff's conduct. (R. at 252). Physical examination revealed Plaintiff's neck to be non-tender, his back to be non-tender, and his extremities to be non-tender. (R. at 248). He had no motor or sensory deficits. (R. at 249). An x-ray of Plaintiff's cervical spine revealed only "very mild degenerative spondylosis." (R. at 249). A CT scan of Plaintiff's head revealed only the existence of a polyp or retention cyst in the left maxillary antrum. (R. at 250). Plaintiff refused care for his laceration. (R. at 251). Plaintiff was diagnosed with a scalp contusion and cervical strain. (R. at 254). He was discharged that same day. (R. at 254 – 55).

Plaintiff was examined by Dr. Balestrino on December 11, 2008. (R. at 345). Plaintiff presented complaining of dizziness and an odd sensation in his head. (R. at 345). He denied headache, visual disturbance, numbness or weakness in the arms or legs, and focal numbness or weakness. (R. at 345). His dizziness had been present for two to three days, and came in five to ten minute episodes. (R. at 345). While Dr. Balestrino noted that Plaintiff had a history of MS, and that Plaintiff had been seeking treatment for the condition, he also acknowledged that Plaintiff did not take any medications for MS. (R. at 345). Upon inspection, Plaintiff appeared well, was asymptomatic, and had full range of motion in his neck, no motor or sensory deficits, normal gait, and some stiffness. (R. at 345). Dr. Balestrino was unsure of the cause of Plaintiff's dizziness, but considered it to be potentially linked to MS. (R. at 345). Plaintiff was noted to have a history of chronic pain and seizure disorder. (R. at 345). No treatment was prescribed.

Plaintiff returned to Dr. Balestrino's office on February 10, 2009, and was examined by nurse practitioner Gretchen Bishop, C.R.N.P. (R. at 344). Plaintiff complained of leg weakness

and dizziness resulting in a fall. (R. at 344). Plaintiff also complained of mid-back pain radiating in his right lateral chest. (R. at 344). Plaintiff reported that he was being treated by a neurologist for MS. (R. at 344). Plaintiff was observed to be in no acute distress, and had normal strength and sensation. (R. at 344). Plaintiff was using a cane. (R. at 344). He claimed that prescribed Darvocet was not helping his pain. (R. at 344). He was provided with Voltaren. (R. at 344). X-rays revealed a normal thoracic spine. (R. at 372).

On March 17, 2009, neurologist Galen Mitchell, M.D., with whom Plaintiff had been in treatment since February 2009, indicated that all objective medical testing had failed to account for Plaintiff's complaints of weakness, numbness, tingling, urinary retention, and solid dysphagia. (R. at 340). While MRI studies of Plaintiff's brain revealed moderate signal abnormalities, these were not typical of MS. (R. at 340). Most other tests performed returned normal results. (R. at 340). In a further attempt to identify a cause for Plaintiff's alleged symptoms, Dr. Mitchell ordered a cerebrospinal fluid study with an MS screen. (R. at 340).

Plaintiff appeared at Dr. Balestrino's practice on April 15, 2009, and was examined by nurse practitioner Michael Neiswonger, C.R.N.P. (R. at 556). Plaintiff complained of long-standing upper and lower back pain. (R. at 556). Injections recently received at the Butler Memorial Hospital Pain Clinic did not provide relief. (R. at 556). Plaintiff was referred to another pain clinic. (R. at 556). He was provided with Clinoril for his pain. (R. at 556). Plaintiff was not to be given narcotics. (R. at 556). It was also noted that Plaintiff had failed to keep appointments for neurological testing for potential MS. (R. at 556). He was rescheduled. (R. at 556). Upon examination, Mr. Neiswonger observed that Plaintiff was neurologically intact, exhibited appropriate insight and judgment, and was alert and oriented. (R. at 556).

Plaintiff was seen by Dr. Balestrino on June 26, 2009 for complaints of neck pain and possible MS symptoms. (R. at 555). Dr. Balestrino observed that Plaintiff had "not been terribly symptomatic," and did "not appear to have acute symptoms of MS." (R. at 555). Plaintiff had also failed to obtain a lumbar puncture recommended by two neurologists for diagnosis of MS. (R. at 555). Plaintiff was advised to follow through with these recommendations. (R. at 555).

On August 3, 2009, Plaintiff appeared at the emergency department of Butler Memorial Hospital complaining of an unremitting headache following a lumbar puncture. (R. at 616 – 18). He arrived by himself and was ambulatory. (R. at 616). He had no gait abnormality. (R. at 617). He did not have a fever, numbness, or weakness. (R. at 617). He was alert and appeared to be in no acute distress. (R. at 617). His neck was non-tender, and he had no motor or sensory deficits. (R. at 617). Plaintiff was medicated, and was discharged once he began to feel better. (R. at 618).

Plaintiff began treatment at the Irene Stacy Community Mental Health Center ("Irene Tracy") in Butler, Pennsylvania, in August 2009. An initial Psychiatric Evaluation was completed by psychiatrist Randon Simmons, M.D. (R. at 612 – 14). Plaintiff informed Dr. Simmons that he felt depressed "all the time." (R. at 612). Dr. Simmons noted that despite a history of hospitalizations for overdose attempts, Plaintiff never followed-through with outpatient treatment consistently, had compliance issues, and was discharged from past treatment due to poor attendance. (R. at 612). Plaintiff reported that prescription medication provided in past treatment provided little relief. (R. at 612). Many of Plaintiff's overdoses were associated with alcohol consumption; although, Plaintiff claimed not to have had anything to drink for "a few months." (R. at 612). Plaintiff claimed that he was depressed due to his unemployment, but that he could not work because of MS symptoms, including leg weakness. (R. at 612). Plaintiff

also stated that he had two bulging lumbar discs, two problematic cervical discs, and chronic pain for which he was prescribed Darvocet. (R. at 613).

Dr. Simmons observed Plaintiff to have restricted affect. (R. at 613). However, Plaintiff was cooperative and spontaneous, demonstrated logical thought and appropriate association, and average to low-average intelligence. (R. at 613). Plaintiff was diagnosed with recurrent, severe major depressive disorder, MS, and chronic pain. (R. at 614). He was assigned a global assessment of functioning ("GAF") score of 40. (R. at 614).

Plaintiff was examined by neurologist Dr. Mitchell again in September 2009. (R. at 546 – 47). Dr. Mitchell opined that Plaintiff had undergone a thorough battery of tests to determine the etiology of his subjective complaints, but to no avail. (R. at 546 – 47). Test results were not typical for MS, and were – by and large – normal. (R. at 546 – 47). Brain signal abnormalities were stable, as were Plaintiff's other complained of symptoms. (R. at 546 – 47). Plaintiff had full to slightly less than full motor strength, normal sensation, and normal head and neck examinations. (R. at 546 – 47).

Records from Irene Tracy show that Plaintiff attended a medication evaluation on October 20, 2009. (R. at 611). His mood was problematic and he was having difficulty sleeping. (R. at 611). He stated that he was "doing alright." (R. at 611). A sleep aid was prescribed. (R. at 611).

On December 11, 2009, Dr. Balestrino treated Plaintiff for complaints of chronic neck and back pain. (R. at 553). Dr. Balestrino noted Plaintiff's treatment for potential MS, and that Plaintiff had failed to obtain an MRI ordered by his neurologist. (R. at 553). Upon examination, Plaintiff appeared well, had diminished range of motion in his neck with some paraspinal tenderness, and mild paraspinal tenderness in the upper spine. (R. at 553).

Upon his final visit to Dr. Mitchell's office in February 2010, Plaintiff's symptoms were again noted to be stable and inconsistent with MS. (R. at 542 – 43). Diagnostic testing results were normal or near normal. (R. at 542 – 43). No treatment was suggested, and Plaintiff was advised to return in one year. (R. at 542 – 43).

Plaintiff was seen again by Dr. Balestrino on March 5, 2010. (R. at 552). He continued to complain of chronic back pain. (R. at 552). It had allegedly worsened, and was now radiating into his legs – making it difficult to walk. (R. at 552). Dr. Balestrino noted that Plaintiff's neurologist did not diagnose him with MS, or recommend any treatment. (R. at 552). Upon examination, Dr. Balestrino found Plaintiff's back to be moderately tender, he had straight leg raising positive on the left, he had good strength, and he had good range of motion. (R. at 552). Dr. Balestrino assessed Plaintiff with acute exacerbation of chronic back pain with radicular symptoms, seizure disorder, and chronic psychiatric disorder for which he allegedly sought treatment. (R. at 552).

Plaintiff was examined by pain specialist Levi K. Zimmerman, M.D. on March 15, 2010. (R. at 594 – 97). Plaintiff's primary complaints were of ongoing neck and lower back pain for the past two years. (R. at 594). Plaintiff claimed that he was "being worked up for multiple sclerosis." (R. at 594). Plaintiff denied motor weakness. (R. at 594). His pain was constant, and could be in the form of aching, burning, electrical shock, squeezing, throbbing, and tingling. (R. at 594). He also claimed to experience numbness and difficulty holding objects. (R. at 594). Almost any sort of movement exacerbated Plaintiff's pain. (R. at 594).

Upon physical inspection, Dr. Zimmerman noted that Plaintiff did not exhibit any pain mannerisms. (R. at 595). He was in no acute distress. (R. at 595). Plaintiff had no range of motion difficulties in his neck. (R. at 595). Plaintiff was grossly intact, had good sensation

neurologically, and exhibited significant Waddell signs with respect to pain in the lower back, including overreaction and inconsistent responses. (R. at 595). Plaintiff was considered to have only mild muscle spasm in the lower lumbar paraspinous musculature. (R. at 595 – 96). Dr. Zimmerman believed the physical examination results to be suspect. (R. at 596). Conservative therapy, including the use of a TENS unit, stretching, and physical therapy, was recommended. (R. at 596). Plaintiff was also a potential candidate for trigger point injections. (R. at 596). Dr. Zimmerman opined that Plaintiff should engage in cognitive behavioral therapy and coping skill management for his mental issues, which may have affected his alleged pain. (R. at 596).

On March 19, 2010, Plaintiff returned to Dr. Zimmerman to receive trigger point injections. (R. at 592 – 93). At that time, Dr. Zimmerman observed significant myofascial spams. (R. at 592). Plaintiff had not followed through with seeking additional recommended MRI studies or a TENS unit. (R. at 592). Plaintiff had an over-exaggerated and inconsistent pain response in his lower back upon physical examination. (R. at 592). Depending upon the results of further MRI studies, Dr. Zimmerman believed that muscle relaxants and anti-inflammatories might be the best option for Plaintiff. (R. at 593).

On March 23, 2010, Plaintiff obtained an MRI and x-ray of his lumbar spine. (R. at 635 – 36). Results revealed small to moderate central L4 – L5 and L5 – S1 disc protrusions, and minimal degenerative changes. (R. at 635 – 36).

Following sleep studies on March 27 and April 10, 2010, Plaintiff was diagnosed with mixed obstructive central apneas. (R. at 637 – 40). Near complete reversal of the disorder was achieved with the use of a CPAP machine. (R. at 637). Plaintiff was advised to obtain a CPAP machine for treatment. (R. at 637).

Plaintiff was seen for a medication evaluation at Irene Tracy on April 12, 2010. (R. at 610). His mood was still problematic, and his affect was restricted. (R. at 610). He reported that he tried to use a TENS unit for his back pain, but that it gave him a seizure. (R. at 610). He also reported that he was going to try to use a CPAP machine for sleep apnea. (R. at 610). Plaintiff was prescribed Seroquel and Cymbalta. (R. at 610).

### 4. Functional Capacity Evaluations

On June 11, 2009, psychologist Suzanne Houk, Ph.D. completed a Clinical Psychological Disability Evaluation of Plaintiff on behalf of the Bureau of Disability Determination. (R. at 432 – 38). Plaintiff walked to the appointment. (R. at 432). He had lost his driver's license as a result of driving while intoxicated. (R. at 432). Plaintiff was noted to have worked as a cook for an undefined period between January and March 2009. (R. at 432). Plaintiff reportedly quit as a result of a disagreement with his boss. (R. at 432). Plaintiff claimed that he had never been terminated from a position because of difficulties with supervisors or co-workers, and characterized himself as an easy going person without problems getting along with others. (R. at 432).

Dr. Houk noted that a review of Plaintiff's medical record showed past diagnoses of alcohol dependence and major depressive disorder. (R. at 432 – 33). Plaintiff alleged that he began abusing alcohol at thirteen or fourteen years of age, and had attempted suicide on a number of occasions. (R. at 432 – 33). At the time of his evaluation, Plaintiff stated that he only drank "a couple of beers here and there once or twice a week." (R. at 433). Plaintiff also had a history of violent behavior and incarceration. (R. at 433). Plaintiff claimed that he had been diagnosed with bipolar disorder, MS, seizure disorder, and crushed and bulging discs in his spine. (R. at 434).

Plaintiff reported feeling rather depressed at his evaluation, but also admitted that he had not taken his prescribed medications for two weeks. (R. at 434). Plaintiff had a circle of friends, but reported that he did not spend much time with them. (R. at 434). Plaintiff made inconsistent statements with respect to the number of children that he had. (R. at 434).

Plaintiff was observed to make eye contact, and was cooperative. (R. at 435). His speech was flat, his mood was depressed, his affect was restricted, his thoughts were relevant, he understood simple proverbs, he demonstrated intact concentration, he calculated serial 7's with only one error, he could repeat four digits backwards, he could spell "earth" backwards, his attention span was in the low average range, he was oriented, he had variable memory, he had control over his impulses, and he had fair judgment. (R. at 435).

Dr. Houk diagnosed Plaintiff with recurrent, moderate to severe major depressive disorder, and alcohol dependence in partial remission. (R. at 435). Plaintiff's prognosis was highly guarded, and he was advised to participate in consistent treatment for his mental condition. (R. at 436). As a result of his diagnoses, Plaintiff was believed to experience marked limitation with understanding, remembering, and carrying out detailed instructions. (R. at 437). He would have moderate to marked difficulty with responding appropriately to pressures in a usual work setting. (R. at 437). He would have moderate limitation with respect to understanding, remembering, and carrying out simple instructions, and making judgments on simple work-related decisions. (R. at 437). He could manage benefits in his own best interests. (R. at 438). Alcohol consumption did not contribute to the limitations found by Dr. Houk. (R. at 438).

On June 15, 2009, Plaintiff was seen by Dennis M. Demby, M.D. for a disability evaluation. (R. at 439 – 43). Plaintiff informed Dr. Demby that he was diagnosed with MS three

to four years earlier, had difficulty walking more than two blocks before his legs became weak, and had to rest for fifteen to twenty minutes. (R. at 439). Plaintiff also experienced intermittent dizziness. (R. at 439). Plaintiff stated that he had degenerative disc disease for the past five or six years, that he was in constant pain, and that his neck was similarly affected. (R. at 439). Plaintiff told Dr. Demby that he had been diagnosed with a seizure disorder at age thirteen, and that he had experienced a seizure two months before his evaluation. (R. at 439). Plaintiff stated that he was on Tegretol for his seizures. (R. at 439). Plaintiff claimed to be hospitalized for a heart attack three to four years prior to his evaluation. (R. at 439).

Upon examination, Dr. Demby noted that Plaintiff had no recurrent headaches, some bilateral knee pain, positive straight leg raising on the right while supine, pain in the lower back with bending, poor heel strike and limping of the left leg, difficulty lifting, intact sensation, good grip strength, full muscle strength, and the ability to walk on heels and toes. (R. at 440 – 41). Dr. Demby diagnosed Plaintiff with MS, low back pain secondary to degenerative disc disease, cervical pain secondary to degenerative disc disease, and seizure disorder. (R. at 443). Plaintiff was limited to lifting and carrying ten pounds occasionally and two to three pounds frequently, and to standing and walking no more than one or two hours. (R. at 441). Plaintiff could never be required to bend, kneel, stoop, crouch, balance, or climb. (R. at 442).

On June 24, 2009, state agency evaluator Juan B. Mari-Mayans, M.D. completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. at 444 – 50). Dr. Mari-Mayans concluded that a review of the medical record supported the existence of insidiously progressive neurological disorder. (R. at 444). As a result, Plaintiff was found capable of occasionally lifting and carrying twenty pounds, frequently lifting ten pounds, standing and walking approximately six hours of an eight hour work day, and sitting six hours.

(R. at 445). Plaintiff would need to avoid all exposure to work place hazards such as machinery and heights. (R. at 447). Dr. Mari-Mayans supported his conclusions by looking to a treatment history which did not reflect the severity of impairment alleged by Plaintiff. (R. at 449 – 50). Further, he did not accord Dr. Demby's assessment full weight because it was heavily reliant upon Plaintiff's subjective averments which were inconsistent with the objective treatment record. (R. at 449 – 50).

On June 30, 2009, nurse practitioner Terri Sharo, C.R.N.P., with whom Plaintiff had allegedly been treated for his mental condition, completed a psychiatric questionnaire. (R. at 452 – 62). She indicated that Plaintiff had been under her care, monthly, for approximately nine months in 2007, and for approximately six months in 2009. (R. at 452). Ms. Sharo stated that Plaintiff had been diagnosed with recurrent, moderate major depressive disorder, and panic disorder with agoraphobia. (R. at 452). Ms. Sharo believed that as a result of these conditions, Plaintiff was incapable of working. (R. at 453). She cited to difficulty with anger outbursts, difficulty in social settings, high anxiety, labile mood, depression, and agitation. (R. at 453). Plaintiff was said to become overwhelmed easily. (R. at 453). She noted that he was not manic or bipolar. (R. at 455). However, Plaintiff had lost interest in activities, had appetite disturbance, had sleep disturbance, had psychomotor agitation or retardation, had decreased energy, had feelings of guilt and worthlessness, had difficulty concentrating, and had thoughts of suicide. (R. at 454). Ms. Sharo also noted that Plaintiff had recurrent, severe panic attacks. (R. at 456).

Ms. Sharo further found that with respect to activities of daily living, Plaintiff had only slight limitation. (R. at 457). Yet, he had marked difficulty with maintaining social functioning, frequent deficiencies in concentration, persistence, and pace, and repeated episodes of decompensation of extended duration. (R. at 457). Ms. Sharo was "unable to assess" Plaintiff's

functional ability with respect to activities of daily living, but was able to note that Plaintiff did not get along with others, avoided social contact, had difficulty communicating, had social anxiety, did not interact well with authority figures, had difficulty maintaining employment due to conflicts with co-workers, and had a history of fighting, incarceration, and driving while intoxicated. (R. at 459 – 60). Ms. Sharo went on to state that Plaintiff had difficulty with memory, lacked focus, had difficulty with decision making, and had difficulty with task completion. (R. at 460 – 61). Pain was believed to worsen Plaintiff's ability to work consistently. (R. at 461). Stress, anxiety, and ease of agitation also gave Plaintiff difficulties with changes in routine, deadline, conflict, decision making, and attendance. (R. at 461 – 62).

On July 13, 2009, state agency evaluator Grant W. Croyle, Ph.D. completed a Mental RFC of Plaintiff. (R. at 463 – 66). Based upon his review of the medical record, Dr. Croyle believed the evidence supported finding that Plaintiff suffered affective disorders and substance addiction disorders. (R. at 463). Yet, Plaintiff was only insignificantly to moderately limited in all areas of functioning. (R. at 463 – 64). Dr. Croyle opined that such limitations did not preclude Plaintiff from engaging in substantial gainful activity in the form of simple, routine, repetitive work performed in a stable environment and requiring making and carrying out only short, simple instructions. (R. at 465 – 66). Dr. Croyle referenced Dr. Houk's assessment as support for his findings, and believed the assessments to be consistent. (R. at 465).

In early April 2010, Dr. Simmons and therapist Brittany Conzo completed a Questionnaire Regarding Medical Condition for Plaintiff. (R. at 600 – 09). In it they noted that Plaintiff had been receiving treatment once or twice a month for eight months at Irene Tracy. (R. at 600). His diagnosis was recurrent, severe major depressive disorder, and he was considered to be unable to work. (R. at 600 – 01). It was believed that Plaintiff's depressive symptoms

prevented him from concentrating such that he could not complete simple tasks. (R. at 601). He was also noted to have low energy. (R. at 601).

Plaintiff's depression was characterized by loss of interest in activities, sleep disturbance, decreased energy, feelings of guilt and worthlessness, difficulty concentrating or thinking, and thoughts of suicide. (R. at 602). He was considered to have marked restriction in activities of daily living, moderate difficulties maintaining social functioning, and repeated episodes of decompensation of extended duration. (R. at 604). However, Plaintiff's treatment providers also indicated that they lacked evidence to indicate the degree of Plaintiff's deficiency with respect to concentration, persistence, or pace, particularly with respect to task completion. (R. at 604). While Plaintiff was considered to be limited by pain in terms of cleaning and using public transit, Plaintiff's treatment providers could not explain his ability to complete other activities of daily living such as shopping, cooking, and paying bills. (R. at 605). Plaintiff's treatment providers went on to state that depressed mood, anxiety, and difficulty communicating limited Plaintiff's social functioning, he struggled to complete tasks and work within a timeframe, he had difficulty with decisions, he was unable to adapt, deadlines provoked anxiety, and his temper flared in reaction to conflict. (R. at 606 – 09).

On April 27, 2010, psychiatrist Robert L. Eisler, M.D. completed a Psychiatric Evaluation of Plaintiff. (R. at 652 – 56). Dr. Eisler noted that Plaintiff arrived with his wife to the evaluation, was on time, was personable and cooperative, was neatly dressed and groomed, was of average intelligence, and was reliable. (R. at 652). Plaintiff informed Dr. Eisler that he had MS, which caused his legs to be weak and give out. (R. at 652). He alleged that one such incident at a previous place of employment resulted in his falling into a hot grill. (R. at 652). On another occasion, he allegedly almost cut off his right thumb; although, it was successfully

reattached. (R. at 652). Plaintiff reported having bulging discs in his lumbar spine, and problematic discs in his cervical spine. (R. at 652). Plaintiff took Suledec for his pain, Tegretol for seizures, Prilosec for stomach pain, and Seroquel and Cymbalta for psychiatric issues. (R. at 652). Plaintiff claimed that his seizures were the reason he no longer drove. (R. at 652).

Plaintiff described beginning to drink at age nineteen, eventually resulting in constant drunkenness, driving while intoxicated, violent altercations, and fines and incarceration. (R. at 652). Plaintiff stated that he had more recently been active in Alcoholics Anonymous ("AA"), and had completed all twelve steps in the program. (R. at 653). He claimed to have been in rehabilitative programs on three occasions. (R. at 653). Plaintiff further alleged that while his drinking was limited to occasional beers over the last few years, he had decided to abstain altogether and return to AA. (R. at 653).

Dr. Eisler opined that in light of Plaintiff's history, he believed that Plaintiff's "use of a few beers has probably been [sic] little detrimental effect on this patient in recent years." (R. at 653). Dr. Eisler also indicated that Plaintiff's depression was accompanied by psychosis – Plaintiff explaining to Dr. Eisler that he heard male voices encouraging him to take his own life. (R. at 653). Plaintiff remembered four out of four test words, was fully oriented, did well with serial subtraction, named places and foreign cities, gave compass directions correctly, named the state's governor, repeated a seven digit number, and had mixed results with judgment questions. (R. at 653).

Dr. Eisler ultimately diagnosed Plaintiff with major depressive disorder with psychosis, MS, back lesions, alcohol dependency in recovery, and grand mal seizure. (R. at 653). Plaintiff's prognosis was poor due to his past failure to respond to therapy and prescription medication. (R. at 653). Dr. Eisler concluded that Plaintiff was incapable of work. (R. at 653).

He assigned a GAF score of 20. (R. at 653). With respect to specific functional limitations, Dr. Eisler determined that Plaintiff would have poor or no ability to interact with supervisors, deal with work stresses, understand, remember, and carry out complex job instructions, understand, remember, and carry out detailed but not complex job instructions, and relate predictably in social situations. (R. at 654 – 55). Plaintiff did retain the ability to manage his benefits in his own best interests. (R. at 656).

In April/May 2010, Dr. Simmons and therapist Conzo completed an addendum to an earlier Questionnaire Regarding Medical Condition, to address Plaintiff's alcohol use on his functional ability. (R. at 658). In it, they stated that Plaintiff had not abused alcohol in two years, and that his current mental impairments were not enhanced by alcohol use. (R. at 658).

### 5. Administrative Hearing Testimony

In response to questioning by the ALJ, Plaintiff testified that he believed he was incapable of working due to an inability to concentrate, racing thoughts, anxiety, panic attacks, depression, fatigue, and anger. (R. at 65, 74 – 77). Physically, Plaintiff described experiencing significant pain in his neck and back which radiated into his arms and legs. (R. at 66). He also complained of accompanying headaches every day for two or three hours. (R. at 71 – 72). Plaintiff alleged that he could sit for only half an hour, and that he would have to lie down two or three times per day to relieve pain. (R. at 66, 76). Plaintiff's back pain interrupted his nighttime sleep. (R. at 67). His legs often became weak and would "give out." (R. at 73). He claimed to require a cane, although he was not using one at the time of his hearing. (R. at 73 – 74). Plaintiff had not experienced a seizure in years. (R. at 74). Plaintiff claimed that several doctors diagnosed him with MS, but that others were not sure whether or not he suffered from MS. (R. at 75). He alleged having dizzy spells. (R. at 75). Plaintiff claimed that his medications for his

conditions sometimes made him drowsy or dizzy.  (R. at 67 – 68).  Plaintiff had been receiving health benefits through the state for several years for his medical treatment.  (R. at 65).

Plaintiff testified that he lived with his disabled wife.  (R. at 68).  He claimed that she had a "learning disorder."  (R. at 68).  He would accompany her to the post office several times per week.  (R. at 68).  He would occasionally help her with cooking.  (R. at 71).  Plaintiff did not drive due to a license suspension for driving while intoxicated.  (R. at 71).  In response to questioning by the ALJ, Plaintiff stated that he had not worked in any sense since November 19, 2008.  (R. at 64).  In response to questioning by his attorney, Plaintiff admitted that he had worked part-time in early 2009.  (R. at 76).

Plaintiff acknowledged that he had an alcohol abuse problem.  (R. at 68).  He explained that alcohol consumption often made him violent, and that he had been incarcerated on a number of occasions.  (R. at 69).  Plaintiff had also experienced issues with being intoxicated while at work.  (R. at 79).  Plaintiff claimed that his alcohol use had declined, however.  (R. at 69).  He stated that he only consumed a six pack once a week while watching football.  (R. at 69, 84).  Otherwise, he allegedly consumed alcohol approximately every other month.  (R. at 69).  He admitted that he still became intoxicated on occasion.  (R. at 69).  He may drink up to twelve beers at a time.  (R. at 70).  Plaintiff had not participated in a rehabilitation program since the 1990's.  (R. at 70).  He no longer attended, because "[r]ehab can only teach you so much."  (R. at 70).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be eligible for a significant number of full-time jobs in existence in the national economy if limited to work involving lifting and carrying no more than ten pounds occasionally and two or three

pounds frequently, standing or walking more than one or two hours of an eight hour workday, sitting for eight hours, no bending, kneeling, stooping, crouching, balancing, or climbing, and no wetness. (R. at 79). The vocational expert replied that such a person would be capable of a number of jobs at the sedentary level. (R. at 79). Examples included positions such as "machine feeders and off bearers," with 72,000 such positions available in the national economy, as "document preparers," with 124,000 positions available, and in "bench assembly," with 160,000 positions available. (R. at 79 – 80).

The ALJ went on to ask whether the vocational expert's opinion would change if the hypothetical person would also be limited to simple, routine, repetitive tasks not performed in a fast paced production environment, with relatively few workplace changes and only occasional interaction with supervisors, co-workers, and the public. (R. at 80). The vocational expert responded that his original answer to the ALJ's hypothetical would not change. (R. at 80). The ALJ added that the hypothetical person would have the additional limitation of no bending. (R. at 80). The vocational expert's response was the same. (R. at 80).

The ALJ then formulated a new hypothetical, and asked the vocational expert whether a person limited to lifting and carrying no more than ten pounds occasionally, lifting and carrying three or five pounds frequently, sitting no more than six hours of an eight hour work day, standing and walking no more than two hours, alternating between sitting for forty five minutes and standing for fifteen, with the ability to stretch and move two minutes of every hour, no more than simple, routine, repetitive work, only occasional interaction with supervisors, co-workers, or the general public, occasional bending, no kneeling, stooping, crouching, balancing, or climbing, and no exposure to wetness, would be capable of working full-time. (R. at 81 – 82). The vocational expert's response remained the same. (R. at 82).

The ALJ added that the hypothetical person would need to lie down two or three times per day for an hour. (R. at 82). The vocational expert stated that no full-time jobs would be available to such a person. (R. at 82). The ALJ also added that the hypothetical person would be absent four times per month due to intoxication or any other ailment. (R. at 82 – 83). The vocational expert explained that no full-time work would be available. (R. at 83). Employers would tolerate no more than one absence per month. (R. at 84).

The ALJ closed the hearing by requesting that Plaintiff seek clarification from his treating psychiatrist and/or therapist regarding the extent to which his alcohol use affected his functioning. (R. at 85). The ALJ held the record open for this purpose. (R. at 86). It was his opinion that if these sources' opinions of Plaintiff's functionality were not accompanied by analysis of his alcohol use that – in light of Plaintiff's significant history of alcohol abuse – he could not give the opinions significant weight. (R. at 85 – 86).

**B.**     **ANALYSIS**

### 1. Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a

combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues.  42 U.S.C. §§ 405(g)[2], 1383(c)(3)[3]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999).  Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole.  *See* 5 U.S.C. §706.  The district court must then

---

[2]    Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3]    Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

### 2. Discussion

In his decision, the ALJ found that Plaintiff experienced medically determinable severe impairment in the way of degenerative disc disease of the cervical and lumbar spine, congenital deformity of the right elbow status post surgical improvement, carpal tunnel syndrome, seizure disorder, neurological disorder (possible MS), sleep apnea, hearing loss in the right ear, gastroesophageal reflux disease, depressive disorder, and a continuing history of alcohol abuse

and dependence. (R. at 22). As a result of said impairments, Plaintiff was determined to be limited to sedentary work involving no more than one or two hours of an eight hour work day standing and walking, up to eight hours sitting, no bending, kneeling, stooping, crouching, balancing, or climbing, no more than simple, routine, repetitive tasks not performed in a fast paced production environment, few workplace changes, only occasional interaction with supervisors, co-workers, and the general public, and no exposure to wetness. (R. at 25). Based upon the testimony of the vocation expert, however, the ALJ concluded that – in spite of his functional limitations – Plaintiff was capable of sustaining full-time employment. (R. at 25). He was not, therefore, found eligible for DIB or SSI. (R. at 55 – 56).

Plaintiff objects to the decision of the ALJ, arguing that he erred in failing to find Plaintiff disabled under 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.04 (Affective Disorders), in disregarding the opinions of treating and examining physicians, and – as a result – in relying upon an incomplete RFC and hypothetical question to the vocational expert. (ECF No. 12 at 14 – 29). Plaintiff also claimed that the ALJ exhibited bias through his conduct during the administrative hearing. (*Id.*). Defendant counters that the ALJ adequately supported his decision with substantial evidence from the record, and should be affirmed. (ECF No. 14 at 14 – 26). The court agrees with Defendant.

A.  Step 3 Determination

With respect to his determination at Step 3, Plaintiff argues that the ALJ should have found Plaintiff eligible for DIB and SSI under Listing 12.04, specifically under Part B. In particular, Plaintiff argues that the findings of nurse practitioner Sharo and Dr. Simmons confirm Plaintiff's eligibility. Listing 12.04 provides, in relevant part, that affective disorders are:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

\*\*\*

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.04B. Assuming, for the sake of argument, that Plaintiff's contention that he meets the part A criteria is valid, the court still finds unavailing his claim as to part B.

With respect to Ms. Sharo's opinion of Plaintiff's functionality, the ALJ had a number of compelling reasons for discounting its weight. First and perhaps most importantly, there was a total lack of objective evidence in the form of treatment notes to back Ms. Sharo's claim that she had an extended treatment relationship with Plaintiff, or to support her specific functionality findings. (R. at 24, 34 – 35, 52 – 53). There was no mention of the manner in which Plaintiff was treated, or of the methodologies used, and the relative successfulness of treatment. (R. at 24, 34 – 35, 52 – 53). Further, despite allegedly having over one year, combined, of treatment experience with Plaintiff, Ms. Sharo was unable to assess Plaintiff's abilities with respect to his daily activities. (R. at 24, 34 – 35, 52 – 53). This certainly runs counter to the underlying assumption that Ms. Sharo's functionality assessment was supported by a thorough treatment history.

Additionally, Ms. Sharo's specific findings – facially – do not meet Listing 12.04B's requirements. While Plaintiff was noted to have "marked" limitation with respect to maintaining social functioning, Ms. Sharo's findings of "slight" limitations with activities of daily living and "frequent deficiencies" with concentration, persistence, and pace do not satisfy 12.04B's requirements. Further, her indication that Plaintiff experienced sufficient decompensation was unsupported. In order for a claimant to satisfy the requirements for "repeated episodes of decompensation, each of extended duration," the claimant must demonstrate:

> exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

> The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.00(C)(4). Ms. Sharo did not point to any evidence in the record which met the above requirements.

With respect to the findings of Dr. Simmons, the ALJ again noted a near complete lack of objective treatment records to support his conclusions. (R. at 37 – 38, 41 – 42). It was alleged that Plaintiff was treated by Dr. Simmons and therapist Brittany Conzo once or twice per month for eight months, yet there was no evidence to support such a claim.

(R. at 37 – 38, 41 – 42).  As with Ms. Sharo, in spite of an allegedly significant treatment history, Dr. Simmons and Ms. Conzo were incapable of fully assessing Plaintiff's activities of daily living, or concentration, persistence, and pace.  (R. at 37 – 38, 41 – 42).  The court notes that the functionality assessment provided by Dr. Simmons had equivocal findings with respect to these issues.  Yet, Dr. Simmons somehow managed to determine that Plaintiff experienced "marked" limitation in activities of daily living, as well as repeated episodes of decompensation, each of extended duration.  As with Ms. Sharo, Dr. Simmons failed to present evidence to support these conclusions.  (R. at 37 – 38, 41 – 42).

The court notes that the ALJ also generally declined to give full weight to the opinions of Ms. Sharo and Dr. Simmons because of the way in which each addressed the effects of Plaintiff's alcohol abuse on his functioning.  (R. at 35, 45, 54).  Neither indicated that Plaintiff experienced significant limitation as a result of alcohol use.  However, as noted by the ALJ, Plaintiff's own testimony belied such findings, as did his admission to the hospital just prior to his onset date as a result of an alcohol related accident.

Additionally, the notes of Plaintiff's primary care physician and neurologist – the only treatment notes appearing within the record – did not reflect the findings of Ms. Sharo or Dr. Simmons.  (R. at 41).  While Plaintiff objects to the ALJ's reliance upon these notes to deny full weight to the findings of Ms. Sharo and Dr. Simmons, the court must point out that these were the only significant, objective treatment notes available in the medical record with which to compare Ms. Sharo or Dr. Simmons' functionality assessments.

The ALJ provided sufficient justification to accord little weight to the findings of Ms. Sharo and Dr. Simmons.  It has been held that even "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity."  *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)).   A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a physician's opinion outright, or accord it less weight.  *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008).  Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record.  *Plummer v. Apfel*, 186 F. 3d 422, 430 (3d Cir. 1999) (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)).   The determination of disabled status for purposes of receiving benefits – a decision reserved for the Commissioner, only – will not be affected by a medical source simply because it states that a claimant is disabled or unable to work.   20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).   Ms. Sharo and Dr. Simmons' findings that indicated Plaintiff met 12.04B's requirements were not supported by objective evidence from the record and, as demonstrated by the ALJ, were not entitled to full weight.

B.  Opinions of Treating and Examining Physicians

Plaintiff next argues that the ALJ improperly denied due weight to the opinions of his examining physicians/ therapists.  (ECF No. 12 at 14 – 18).  Plaintiff initially focuses upon the conclusions by Ms. Sharo, Dr. Simmons, and Dr. Eisler that Plaintiff was unable to work.  He then goes on to claim that each examining source made consistent findings of moderate to marked limitation which were not included in the ALJ's RFC.  Further, the ALJ's reference to treatment notes from Plaintiff's primary care physician and

neurologist, which lacked any of the above findings, was allegedly inappropriate because Plaintiff was not seeing either of these physicians for his mental health issues.

The court will not rehash the ALJ's treatment of Ms. Sharo and Dr. Simmons' opinions, as this was discussed above in detail, and further finds that the ALJ's similar treatment of Dr. Eisler's opinion was properly supported by substantial evidence. Dr. Eisler made a number of severe limitations findings in spite of relatively normal examination findings. The ALJ rejected these findings for a number of pertinent reasons. The ALJ noted that Plaintiff provided a different history of his past and present alcohol use to Dr. Eisler than to other sources and during the administrative hearing. (R. at 43). Plaintiff also informed Dr. Eisler that he had lost his driver's license as a result of seizures, when in truth he had lost his license due to driving while intoxicated. (R. at 43).

Plaintiff informed Dr. Eisler that he had been diagnosed with MS, when this was not the case. (R. at 43). The ALJ further declined to attribute significant weight to Dr. Eisler's opinion when he determined that Plaintiff's depression was accompanied by psychosis – a finding which had been rejected by other treating sources in the past. (R. at 44). The ALJ noted the lack of mental health treatment records and past indications of treatment non-compliance to cast doubt upon Dr. Eisler's conclusion that past treatment attempts had failed Plaintiff. (R. at 44 – 45, 53 – 54). As had been explained with regards to prior mental health assessments, Dr. Eisler's relatively normal examination findings, as well as his near complete reliance upon Plaintiff's subjective complaints, weakened the credibility of his functional limitations findings. (R. at 44 – 45, 53 – 54). No objective support was provided to demonstrate that Plaintiff's alcohol use did not impact his functioning. (R. at 45, 50, 53 – 54). An ALJ is not in error for declining to

accord full weight to medical opinions which appear to downplay alcohol use. *Rimel v. Astrue*, 2013 WL 1248249 at *2 (3d Cir. Mar. 28, 2013).

Also, Plaintiff again argues that the notes of Drs. Balestrino and Mitchell were inappropriately used to discount the more severe findings of the other doctors on record. Yet, Plaintiff fails to point to any other objective evidence to which the ALJ could have compared or corroborated Plaintiff's psychological assessments. No psychiatric treatment notes appeared on the record – save for two brief medication checks which provided little information. The only other basis for the mental health assessments were Plaintiff's subjective complaints and the ALJ discussed – at length – why Plaintiff was less than credible. Examples included inconsistent reports regarding the cause of the loss of his driver's license, inconsistent reports regarding the dates he last worked, inconsistent statements regarding his alcohol consumption, inconsistent statements regarding past diagnoses of MS and other physical symptoms, frequent non-compliance with recommended procedures, therapy, and medications, and a minimal work history. (R. at 27 – 32, 38, 40, 43 - 44, 46 – 51). Dr. Zimmerman noted on two separate occasions that Plaintiff's pain responses were suspect. (R. at 40, 50).

An ALJ is required to assess the intensity and persistence of a claimant's claimed pain and limitation, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999). This includes determining the accuracy of a claimant's subjective complaints. *Id.* While subjective complaints may support a disability determination, allegations must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F. 2d 31, 37 (3d Cir. 1985); *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 122, 122 (2d Cir. 2000). The ALJ did not err

in according the assessments of Ms. Sharo, Dr. Simmons, and Dr. Eisler lessened weight due to apparent reliance on less than credible subjective complaints with little to no objective medical support.

C. ALJ RFC Assessment

Plaintiff argues that the ALJ did not fashion an appropriate RFC and hypothetical for Plaintiff's mental and physical impairments. As this Court has found no issue with the ALJ's treatment of Plaintiff's mental health history, the Court finds that those portions of Plaintiff's RFC assessment and hypothetical dealing with mental limitations were supported by substantial evidence. With respect to those portions regarding Plaintiff's physical limitations, the Court finds similarly.

Plaintiff would have this Court make medical conclusions not made in the objective record when he asks for a finding that "the positive findings on the various ex-rays and MRI's clearly supports the conclusion that Plaintiff suffers from severe pain in his neck and low back, and that the pain radiates to his extremities." (ECF No. 12 at 23). The objective diagnostic imaging studies revealed no more than moderate levels of degeneration – at most – in Plaintiff's spine. (R. at 28 – 31, 36 – 41, 46). The treatments prescribed included physical therapy, injections, and prescription medication. (R. at 28 – 31, 36 – 41, 46). There was no indication that Plaintiff followed through with physical therapy or with ongoing treatment at any of the pain clinics. (R. at 28 – 31, 36 – 41, 46). Plaintiff was not diagnosed with MS, and no treatments were prescribed for any other potential physical disorders, in spite of Plaintiff's complaints. (R. at 28 – 31, 36 – 41, 46). Furthermore, Dr. Zimmerman believed Plaintiff to be exaggerating symptoms. (R. at 40). None of the objective evidence provided by Plaintiff's examining physicians – as

found within their objective treatment notes – supported the existence of greater limitation than found by Drs. Demby and Mari-Mayans in their physical assessments. These findings were accommodated by the ALJ in his RFC assessment. No error occurred here.

    D. ALJ Bias

In Plaintiff's final argument, it is claimed that the ALJ exhibited bias though his conduct during the administrative hearing and in his written decision. (ECF No. 12 at 25 – 29). Specifically, the ALJ's statement that he would accord little weight to functionality assessments that did not mention Plaintiff's alcohol use, his statement that Plaintiff abused narcotics when the record did not support such a contention, his statement that a suicide attempt by Plaintiff was a "performance," and his attempts to independently interpret medical findings, were all allegedly evidence of bias.

"Essential to a fair hearing is the right to an unbiased judge." *Ventura v. Shalala*, 55 F. 3d 900, 902 (3d Cir. 1995) (citing *Hummel v. Heckler*, 736 F. 2d 91, 93 (3d Cir. 1984)). The due process requirement of impartiality in an administrative proceeding must be rigorously maintained due to the lack of procedural safeguards available in judicial proceedings, and because of the active role of ALJ's in disability determinations. *Id.* (citing *Hess v. Sec'y of Health, Educ., and Welfare*, 497 F. 2d 837, 840 – 41 (3d Cir. 1974)). An ALJ must develop a case fully and fairly. *Id.*

Plaintiff herein does not allege the same sort of pernicious and offensive conduct by the ALJ that has been used to justify remand in other cases. The United States Court of Appeals for the Third Circuit has endorsed a district court's remand for bias where a claimant's hearing was "shameful in its atmosphere of alternating indifference, personal

musing, impatience and condescension." *Ventura*, 55 F. 3d at 905 (quoting *Rosa v. Bowen*, 677 F. Supp. 782, 783 (D.N.J. 1988)). In *Ventura*, the "offensive and unprofessional conduct" meriting remand came in the form of harassment of the claimant and claimant's representative, frequent interruption, coercive, intimidating, and irrelevant questioning, and intentional interference with the admission of relevant evidence. *Id.* at 902 – 04. By his conduct, the ALJ had affirmatively prevented the development of a full and fair record. *Id.* at 904. Such is not the case at present.

While Plaintiff may not have approved of the ALJ's statement that a physician's opinion which failed to mention the extent of Plaintiff's alcohol use was entitled to little consideration, he did not demonstrate that the ALJ attempted to bar admission of any evidence or that he did not consider the evidence. In fact, the ALJ left the record open so that Plaintiff's medical sources could submit additional statements regarding the impact of Plaintiff's alcohol use on his functional capacity. Moreover, the court does not find it to be unreasonable that the ALJ ultimately viewed these medical source opinions with some degree of incredulity.

Here, the ALJ was charged with the duty to weigh evidence and make credibility determinations and, as discussed above, could not reconcile Plaintiff's recent alcohol abuse history – and its effects – with medical source statements claiming that Plaintiff's alcohol abuse was immaterial to his functional capacity. There is no evidence of a failure to develop a full and fair record by the ALJ, and the court will not find that the ALJ's disbelief was akin to bias when supported by substantial evidence from the objective medical record.

With respect to the ALJ's characterization of Plaintiff's medical examinations as a "performance" due to obviously disparate results, the court does not find impropriety requiring remand. (R. at 28). Once again, the ALJ has a duty to weigh the evidence of record and judge credibility. Inconsistency of physical examination results based upon Plaintiff's own conduct reasonably creates questions of validity.

Plaintiff also maintains that the ALJ improperly implied that Plaintiff abused narcotics as an additional means of denying disability benefits. The record does not bear this out. The ALJ noted that following cessation of treatment through an unidentified pain clinic in early 2008, Plaintiff was not to receive narcotics for pain management. (R. at 26). This avoidance of narcotic use for treatment of Plaintiff's pain was reiterated at points in the medical record. While the ALJ did feel that this may have indicated that Plaintiff abused narcotics, this statement did not appear to play any role in Plaintiff's ultimate disability determination, and Plaintiff points to no evidence to support such a conclusion, let alone bias on the part of the ALJ.

## C.   CONCLUSION

The court finds that the ALJ provided ample justification for his disability decision to satisfy the substantial evidence requirement. While Plaintiff took issue with the ALJ's discussion, the Court found no impropriety with the ALJ's treatment of the evidence. Further, the Court must reiterate that the ALJ is required only to provide substantial evidence to support his decision. Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce*, 487 U.S. at 565. "Overall, the substantial evidence standard is a deferential

standard of review." *Jones*, 364 F. 3d at 503. In light of this standard and the ALJ's discussion, the Court finds that the ALJ met his burden.

Based upon the foregoing, the Court respectfully recommends that Plaintiff's Motion for Summary Judgment be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: July 26, 2013
cc/ecf: All counsel of record.